This appeal brings up a judgment of the Passaic County Court affirming an award of the Workmen's Compensation Bureau in favor of plaintiff-respondent.
The sole question presented is whether or not a trauma sustained by respondent's husband on July 24, 1943, aggravated a then present brain tumor and caused his death on November 2, 1946. Appellant denies that the trauma was in any way related to the death of decedent.
Decedent, Joseph Kling, then 39 years of age, admittedly was injured in an accident arising out of and in the course of his employment with appellant on June 24, 1943. On that *Page 153 
day, decedent fell from a platform approximately ten to fifteen feet high, and sustained severe injuries. He was removed to the Passaic General Hospital, where he was treated by his family physician, Dr. J. Reuben Budd. The doctor testified that he saw decedent a short time after his admission to the hospital. He was asked: "Q. And when you saw him in the emergency room, doctor, what observation did you make of him? A. At that particular time he was rather drowsy. Of course, he had responded from being unconscious. And he had a fracture of the radius. I did not know what part at that time. It turned out to be the styloid process of the radius, and a fracture of the head of the left radius. * * *
"Q. Was that the second one? A. Yes.
"Q. What was the first one? A. Fracture of the styloid process of the radius, a fracture of the head of the radius, and a laceration of the left side of the forehead. * * *
"Q. And what about his condition as to being oriented as to time and place? A. At that particular time he was confused, and I was unable to get a complete history immediately."
And Dr. Budd further testified "He had two outstanding symptoms * * * These are complaints which he had early and which persisted right along, except to be aggravated or exaggerated. One was headache, and the second symptom was dizziness, and later on a third symptom which was disturbance of vision. These are the three outstanding symptoms. * * * These headaches were rather severe. They felt deep in the head. He complained that they were deep-seated type of headache. * * * These headaches persisted without abatement from the time he was injured to the time he entered the hospital, this last time I saw him. The dizziness also, and the diminution of vision, that started about January of 1946. * * * The dizziness and headaches were from the very onset and persisted unabated to the time I last saw him." He further testified that he sent decedent to a Dr. Ehrlich, a neurosurgeon, and further testified: "My diagnosis previous to sending him to Dr. Ehrlich was a brain tumor. *Page 154 
"The Court: Of course, that is in addition to the fractures.
"The witness: Oh, yes, that was a separate thing. Of course, previous to that we thought he probably had the remains of a cerebral concussion, but as the case evolved itself and the changes in the eyes occurred and all the symptoms even became worse, we found that we were dealing with a brain tumor. Of course, the signs and symptoms pointed to that. * * * From my history and analysis of this case, this man was symptom-free before the fall." In answer to a question, he answered: "It is my opinion that this fall or accident started a sequence of symptoms, in other words, accelerated the whole process. Of course, this man was apparently symptom-free, and we know that if he did have a neoplasm of the brain, it was quiet, he was able to carry on a day's work; but after this fall the man became disabled. Therefore, it is my opinion that this fall aggravated his symptoms and, in aggravating his symptoms, certainly hastened the final outcome."
Dr. Martland, who performed an autopsy on decedent Kling, testified that the cause of death was found in the head, and that there "was a large tumor in the skull." He further testified:
"Well, all I can say in this case — and I am testifying in this case alone — in this case in my opinion there has been an honest definite history of trauma which was followed shortly after by symptoms of brain tumor. Therefore, in this case, in spite of the findings of no hemorrhage in the tumor three years afterwards, in spite of that, I am of the opinion that this might have some relation to trauma as aggravating a pre-existing tumor. That is all I can say. It might. I can't prove it."
On cross-examination, he was asked:
"Q. My question to you was: Is that your opinion, that this was a probable cause? A. Yes. I wanted to give a fair benefit to everyone concerned, that there is a probability of trauma in this case.
"Q. Probability of trauma? A. Aggravating the tumor. Otherwise it is a natural death brain tumor. *Page 155 
"Q. When you performed your autopsy, however, you ruled out the probability of aggravation, did you not? A. No, I did not.
"Q. `Might' is in the possibility realm, doctor. You are talking about possibility, aren't you? A. No, probability, I said."
A Dr. Kim was called as an expert pathologist and testified:
"It is my opinion that this trauma sustained from the fall had a direct bearing upon the case. * * * I am assuming now that this man had a brain tumor to begin with * * * I do not believe that a trauma caused the tumor formation, but I feel that this man had the tumor at the time of the accident. Whether a trauma will aggravate or accelerate a tumor growth, it is only a probability. You cannot definitely say that it will do that. I will go one step further and say that trauma might even regress a tumor. * * * Whether the tumor will regress, disappear, or remain stationary, or whether it will accelerate and increase in size, you have to decide upon the symptoms and signs dating from the time of the accident. In this case, from all the facts related to me in your question, I feel that this tumor had something done to it by the trauma and hastened its growth subsequent to the injury." He further testified that pure cerebral concussion would not produce symptoms as in this case, but that the "headache or any of the symptoms will not persist for months and years."
The testimony of respondent, the wife of decedent, and that of Mr. Kirchner, who was the owner of appellant company, and the employer of decedent, both testified to the marked change in the appearance and demeanor of decedent, and corroborated the testimony of Dr. Budd. Prior to this accident, he was very active and alert, but after the accident, he "continually had headaches, you could tell by looking at him that he did have them," "he slowed up tremendously." "He was not able to do any work even though he might have tried." It was testified that these symptoms followed the trauma and persisted to the time of his death.
Dr. Blumberg testified for appellant. He examined decedent on October 15, 1943, and on December 12, 1944. He expressed the opinion that decedent had no brain tumor at the time of his accident. However, on cross-examination he said: "I think that tumors can be aggravated by trauma. * * * I would give weight to all the factors in the case. *Page 156 
* * * Of course, if the man had symptoms following a trauma, I certainly would associate those symptoms to the trauma that he had."
A Dr. Gitlitz was called by appellant, and he testified that he could not "assume or postulate that those symptomatic manifestations are significant for the existence of a tumor at that time. * * * I must assume that there was no — at least no severe injury to the tumor at the time of the accident, if a tumor was there." Upon being asked "whether or not he will deny the relationship of trauma to the acceleration, aggravation, precipitation or lighting up of an underlying tumor," he replied: "It is improbable, but deny it I can't."
From a careful review of the testimony and giving due consideration to the testimony of the medical witnesses for both parties, which, in some respects, is in conflict as to the probability of the existence of a tumor at the time of the accident, the conclusion is inescapable that the greater probability is that the tumor was present, that the trauma produced the condition of decedent that was changed from his previous state, and that the symptoms that would warrant the conclusion that the brain tumor was accelerated and aggravated by the trauma is supported by the testimony. We conclude and find that the decedent met his death as a result of the accident of July 24, 1943, arising out of and in the course of his employment.
In Hercules Powder Co. v. Nieratko, 113 N.J.L. 195 (Sup.Ct. 1934); affirmed, 114 Id. 254 (E. A. 1934), it was held "In civil cases it is sufficient if the circumstantial evidence be such as to afford a fair and reasonable presumption of the facts inferred. Circumstantial or presumptive evidence, as a basis for deductive reasoning in the determination of civil causes, is a mere preponderance of probabilities. All that is required is that the claimed conclusion from the offered fact must be a probable or a more probable hypothesis, with reference to the possibility of other hypotheses. The test is probability rather than certainty. Jackson v. Delaware, Lackawanna andWestern Railroad Co., 111 N.J.L. 487." (E. A. 1933). *Page 157 
In the instant case, the testimony supports the determination that the death of Kling would not have occurred as it did, except for the accident, which was a contributing cause therefor.
The respondent has sustained the burden of proof of establishing that the decedent suffered an accident on July 24, 1943, which arose out of and in the course of his employment; that the trauma aggravated and accelerated an existing brain tumor; that by reason of such aggravation or acceleration of the existing brain tumor an operation, performed on November 2, 1946, was necessary and as a result thereof the death of Kling ensued.
The judgment is affirmed.